May it please the Court, my name is Leighton Anderson. I am appearing on behalf of Appellants Garry Dass and J.S.N.D, Inc. With the Court's permission, I will reserve time for rebuttal and in view of the cross-appeal. Your Honor, there are two issues on appeal, both of which concern the oil company's claim, the oil company, the appellee in this case, claim for lost profits damages arising from a preliminary injunction, even though the company did not put on any evidence of its total per gallon profits on sales of gasoline to the appellants while the injunction was in effect. Is that the only way they can show loss? Well, I think that they have to, it's the only way I can think of, Your Honor, to show loss of profits is to analyze the revenue and expense of continuing the injunction in effect and decide whether that's positive or negative. What if they could have charged a higher rent during the period that the injunction was in effect? If they had a contractual right at the time the injunction was granted, but they didn't, if they had a contractual right to charge a higher rent, they would not have been enjoined from doing so. They could not have charged a higher rent without an agreement. What does the 2002 renewal tell us? The 2002 renewal tells us that they were looking for a way around the preliminary injunction. It doesn't tell us anything about what their damages were associated with the issuance of the preliminary injunction. It only tells us that they could have charged a higher rent, or they would have charged a higher rent. Well, it tells us that they wouldn't have charged a higher rent if there was an agreement between the parties, my clients being one of those parties, to continue the franchise for an extended period of time. That's what we wanted. That's what Tosco didn't want to allow us. And the injunction had to do with keeping the franchise that they wanted to end. The injunction had to do with keeping that in effect while the PNPA issues were being litigated. So the question of what damages arise from the issuance of that injunction need to be measured at the time the injunction was issued. And under Nintendo it needs to be compared with, were they stopped from doing what they had the right to do? They could have raised the rent. They could have negotiated a new lease with a higher rent, less rebates. They could have done that. Less rebates, less credits, fewer credits. And as long as it was done on the basis of an agreement with us, and as long as it's in accordance with the Petroleum Marketing Practices Act provision regarding, was it proposed in the normal course of action? Did the district court make a determination that the 2002 lease was made in good faith? It did not. Was it litigated at all? Was that question litigated in the district court? Yes, your honor, it was. It was litigated in the district court. The district court didn't make a finding on that issue. The district court did question in the course of closing argument after the trial night case, did suggest to counsel that the district court questioned what they thought they were doing. It questioned whether that was in good faith. After all, the evidence was that the rent term that they had selected, the task was selected for purposes of that 2002 franchise, was determined in a telephone conversation between the representative who dealt with my clients and in-house counsel for the company. And they were kind of scratching some numbers on a napkin. And the representative, Mr. DeBoer, came up with $8,000 and the attorney in Arizona said, make it nine. Well, they said in the briefs here, I can't remember where I read it, maybe it was in one of the district court documents, that you seem to acknowledge on behalf of your client that they could have charged, that the $8,000 was a reasonable increase in rent. What I said on behalf of my clients is that we would have been willing to pay more rent in exchange for a three-year franchise. They were not, they never were willing to offer us a three-year franchise. I think the fact that they had offered us the 2002 franchise agreement in effect waived any prior basis for non-renewal, but that was litigated in the prior. Mr. Anderson, you in effect got a four-year lease by your injunction. If it's your view that $8,000 would have been a reasonable rent for a three-year lease and the injunction in effect got you four years on the property, why isn't $8,000 then the reasonable rental amount we should assume they could have collected? Well, it's because a discussion in a hypothetical circumstance about what we would be willing to do in exchange for a contract that we never got, in exchange for a contract we never got, regardless of what was the effect of the injunction to preserve the relationship, does not have anything to do, with respect, Your Honor, to the question of what is the damages associated with maintaining the existing franchise relationship as it existed in February 2002 in place. In other words, if we had, if they had offered us a new franchise that was in good faith in the normal course of business, not for the purpose of preventing renewal, issues that were never litigated to a determination, even though we submitted them in the trial court and even urged that issue on appeal the first time around, if they had offered us a franchise that met all of those tests and we had agreed on the terms, that would be one thing, but it's a little... Wait a minute. Can I just step back a minute because something troubled me? The 2002 agreement was proffered or tendered at what point in the litigation, after it had begun? After it had begun, after the issuance of the preliminary injunction. Right, and so, and at some point you said, well, now that you understood what the nature of the provisos were, as I understood your colloquy with the district court, so well that would, it would have been in good faith. You weren't saying you had agreed to it, but the amount that they came up with was at least in good faith. Your Honor, I didn't say that. What I said was that if they had been willing to offer us a three-year franchise, and I can find... Page 189 of the supplemental excerpt. That's the page I have, Your Honor, thank you. What I said was, I wouldn't want the $9,000 number that came magically from the lawyer... Well, you were arguing over eight versus nine, right? Right. Okay, so let's just talk about what the question posed to you. Sure. Seems to me then what you're saying is that if they provided your clients with the $5,000 in rent and gave them a period of time, coextensive with whatever amount of time it was going to take to remediate the property and eliminate the unlimited rent cap, then that would be something that you would find to be in good faith in the ordinary course of business. Your answer is substantially yes. The only quibble I have is I think that $9,000 number came magically from the lawyer, and maybe I'd want the benefit of the $8,000. Okay, so... But yet that's true. And I went on to say some other things that I believe are my material here. Well, I understand, but we're talking about a situation where it was your lawsuit that prevented the negotiations from consummating in a deal. You were using the litigation, were you not, to freeze matters in place. You got an injunction, so we're sitting here now after the fact, and you're saying, well, they haven't been able to prove what would have been if the injunction hadn't been in place. No, Your Honor. There is some evidence in the record that suggests that the 2002 agreement is evidence of an amount of rent that times the number of years would get to the $120,000 bond. Now, why isn't that sufficient under the damage law that affects the measurement of damages for a wrongfully entered injunction? Your Honor, with all respect, I have to go back to the premise of your question because I think it has it exactly backwards, Your Honor. It was not the injunction that prevented negotiation between the parties. TASPA's position at the time the injunction was issued was that the franchise relationship was done. There was no negotiation. They wanted us out. It was after the injunction was issued. You prevented them from negotiating a different lessee, franchisee, let's put it that way. In other words, the real world that they wanted to happen was foreclosed by your lawsuit and injunction. No, Your Honor. The real world that they wanted to happen was to not have a service station there at all. Okay. All right. That's what was foreclosed. They were then put on hold for the duration of the lawsuit in which they had to keep your client in place at a reduced rent. That is, at a rent that was below what you thought would have been a good faith number that they proffered through the 2002 agreement. To call that a reduced rent, I think, is not correct, Your Honor. It was at the same rent. It is at the same rent, Your Honor, and again, the court is suggesting that the injunction somehow prevented them from raising the rent or from negotiating with us to raise the rent. What the injunction prevented them was prevented them from closing the station. That's what they wanted to do. They wanted to close it. They wanted to and couldn't, but they wanted to turn the property back to the property owner. They couldn't do it because of the terms of the lease between them and the property owner, but that's separate from the issue that we're now discussing. The only reason that they came up with the 2002 franchise was not because they wanted to negotiate an increased rent with us for an additional term. I did want to point out, Your Honor, what I said was, and even the court's question to me at that time concerned giving us all of the remaining time on the lease so that we would have all of the time associated with Disappear magically. Well, no, the franchise that they proposed to us would disappear magically. The court's question was, what if you had all the way to the end of their term with the property owner under the environmental holdover clause, which was in effect? And I said, yeah, that's what we want in this case, and we understand that we might pay more rent over the course of time, but that was never on offer, Your Honor. Well, so, Mr. Anderson, if I understand what you're saying, if you had not gone into court and got an injunction, and if they hadn't canceled your franchise, instead if they had come to you at the end of the old franchise and said, we'll give you four more years at $8,000 a month, you would have said, it's a deal. Your Honor, what I would have said is, show me that that is consistent with the terms that you offer to other people. There's a declaration in the district court that was filed by Jeffrey DeBoer. Yes. And it's pretty, it's fairly lengthy. He talks about, he refers to unique rents. Yes, Your Honor. And he, he's not, you know, it's not extremely detailed, but he talks about underperforming stations and the kinds of rent offers that were made, and he seems to suggest that what they did, this offer to you in the 2000, or whatever, however you want to call it, whatever it is, the numbers in the 2000 lease, were in line with what they offered to other non-performing quote-unquote stations. Why isn't that some evidence of what they might have done? Well, Your Honor, he seems to suggest that, but the testimony, when you look at it closely, falls short of actually saying that. And one of the things that I would point you to, Your Honor, is that he talks about what is the target rate of return. And he says in that we've gone from anywhere between $75,000 to $125,000, and we're not really sure, there's some confusion within the company, but for me, I made it $125,000. And even for him making $125,000, he came up with a lower number than what the attorney told him to put in the offer. So I think that it is not evidence, Your Honor, of the provable damages resulting from the injunction that I think is the issue before this court. I think the issue before this court is, once they were told that they couldn't just close the station by reason of the issuance of the preliminary injunction, what damages arose from that? That's what Nintendo says that we should look at, so that's what the Ninth Circuit precedent says we should look at. And I also think that we need to keep in account the specific context of this case which is legislation enacted by Congress to limit and restrain the right of oil companies to... Even if I take your premise that you just said for measuring damages here, it just seems to me no matter what numbers they were turning at this station, if they could have received a higher rent that was in line with all their business dealings with other similar stations, I don't know why they wouldn't have suffered a loss. Explain that to me. I will, Your Honor, because at the time the injunction was issued, they were not trying to get a higher rent. They were trying to close the station. And the way you analyze damages, I believe, Your Honor, with respect to the way the damages issue should be analyzed, at that point in time, looking at what happened when the injunction was issued, it's a question of is the subsequent operations that they conducted that resulted in a loss to them, in which case that would be the measure of their damages. Compared with what? Or did it result in a profit to them, in which case... Compared with what? As compared to what was being... What is the difference between what they would have done had the injunction not issued... That they would have closed the station. Yes, Your Honor. End of story from their operation. Now what should they have proved? What they should have proved... You say now they weren't allowed to close the station, so they operated for four years with Mr. Doss in place under the status quo. So what are they comparing it to? What they could have done with the property, get out from under their arrangement with Thrifty, so on and so forth. So there should have been a trial about what the world would have been but for the lawsuit. I think if you're claiming lost profits resulting from being forced to retain the franchise in place, you should show that you lost profits as a result of being forced to retain the franchise in place. Okay, so somehow having to keep that station operating caused some hit to their bottom line... Well, which they never showed. And in fact, the evidence was that even the way they calculate profits, which doesn't look at the entire per gallon cost, they made about $200,000. Okay. All right. Well, you may want to save the rest of your time. Your Honor, thank you. May it please the Court, Steven Erb for the appellee and cross-appellant, Tosco Corporation. Let me pick up on the theme that the Court was questioning Mr. Anderson about. First of all, there are actually two wrongful acts of enjoining our conduct. The first act was to freeze the franchise, the 1997 franchise, all of its terms and conditions as of the initiation of the lawsuit. We recognized immediately, given even more horrendous economics force at that time, where we were losing $500,000, $200,000, even the site open, and we were operating under a very preferential program that had been consistent with the business plan from the mid-'90s. We recognized that if the lawsuit went on as it did for another four or five years, both in the lower court and then up here, and we were very lucky to get a trial as quickly as we did with Judge Walter. Otherwise, we could have been sitting for three years before we got a trial in the Central District. Well, let's deal with what really happened, not what would have been. Well, we're looking at that and we're saying we need to propose terms more consistent with what any other individual in Mr. Das' position would be offered, which was the purpose of the franchise, the 2002 franchise. And, Your Honor, you referred to testimony by Mr. DeBoer concerning that, but there was also testimony by his supervisor, Mr. Balsheiser, in the  How do you find his testimony all that illuminating? Mr. DeBoer was a little more detailed. Because he's zeroing in on this particular location and the economics for this location, when Mr. Balsheiser is saying, no, this isn't some one-off arrangement for Mr. Das. We've done this on 23 other locations. But the record doesn't really show what those numbers were. What the numbers were in terms of... Yes. Right. I mean, how they arrived at a particular... I got the impression from reading DeBoer's declaration, worse so than the other one, that DeBoer says, okay, look, there are these non-performing, in our vision of site profits, site profit bill, there are these stations that were non-performing. And he points to several here and there and around. Well, we don't really know, in comparison to Mr. Das' station, what the exact rents were and how it all fit together. What I got from DeBoer's declaration was that they were trying to make the point that the rental terms, the new lease terms, the franchise terms that were embodied in the 2000 renewal, were somewhat consistent with what had been happening in other non-performing states. Yes. Now, unfortunately, the district court didn't make that finding. Well, let me address that. There's two issues there, Your Honor. Issue number one, we put the evidence in post-affirmance. When we went down there, we filed our motion. Supplemental excerpts 198... I've got it right here. That's our record, okay? The judge did make a finding, the district court did make a finding that one level of damage, one measure of damages that had been proven with reasonable certainty is the $328,000 or the $369,000. Those figures are based on 8,000 times 41 months or 9,000. That was his finding on remand. He didn't touch the issue the first time around, and the reason for that is because there's really two different issues going on here that constantly get confused when we talk about good faith. Under the PMPA, the federal interest is limited, and this court has talked about this before, the federal interest is limited to looking at the offer and trying to derive whether there's a subjective intent to end the franchise by saying, here, here's our terms, take it or leave it. The motivation for that is to cause a non-renewal, which is the only way ... It's not going to come up in a termination. It's going to come up in a non-renewal. If the district court makes that ... Finder of fact makes that finding, then you have a PMPA problem for a wrongful non-renewal. We didn't get to that issue because the first non-renewal was fine, and we reserved our rights on that. That second offer, the franchise in 2002, never caused a non-renewal because he was always protected by the preliminary injunction. The second issue is if you don't have a PMPA effect, which is a termination or a non-renewal, what law do you look at as to whether the rent terms are enforceable? Several times this court has said, the PMPA and this court and district courts are not going to sit and judge whether particular rent terms are fair or unfair. We're not going to supervise or oversee service station rents. They're subject to the forces of the marketplace. If there was a problem, it had to be proven under state law as unconscionable. Now, with that background, when we go back on remand and I lay out all my facts again, he makes, Das makes no argument on that. In fact, one thing that's awkward about the argument... But Das didn't, Das didn't claim that under state law, the rent was unconscionable. No. No. He, and, you know, one thing that's awkward... Let me ask you this. Could he have argued that there was never a meeting of the minds on the terms of the 2000, there was never an agreement? Well, that's a very complicated issue as to acceptance under protest. That's your pro-sales issue. And whether or not California allows that or not. Our position would be, hey, he stayed in possession. He was well, the very, Judge Walter increased the bond because Mr. Das might be subject to an extra $8,000 or $9,000 per month through the time of trial. Neither he nor I nor anyone else anticipated that the Ninth Circuit Motions Panel would extend that another two and a half years before we got the final thing. So we were always setting bonds based upon an expected trial in November, which happened in January with a decision in... Was there anything that happened in the district court that prevented Mr. Das' counsel, or Mr. Das, from raising the state law issues? On remand or the first time around? On remand. No, I don't think so. He filed papers. He opposed it. I laid my cards on the table as to what my motion would encompass. I did it back in 2003 in front of a motions panel of this court. This is where I'm coming from. I'm going to look for restitution and damages. One of my measures of damages is going to be this enjoined rent increase. And that's like a second wrongful injunction. Injunction number one, make us stay there. Injunction number two, bind us to 1997 terms until this case is totally over. And I think that that second refusal to modify the injunction is actually on less solid footing under the PMPA or any law than the first wrongful injunction, which was a continuation of the relationship. Mr. Earp, you're not trying today to enforce the 2002 agreement, are you? No. Not as a contract, but as evidence admitted by him that this would have been an allowable increase in rent. Would you address his suggestion that the comparison we need to make is between what financially would have happened to your client if they had terminated the franchise and closed this site versus what happened to your client financially under the injunction? Is that the proper comparison? Well, yeah. That's a different route to getting to a different measure of damages. And I was going to address that, Your Honor. So let me take that up. Basically, what would have happened as of March 2002 is the site would have went vacant. Now, immediately, we would have realized a benefit of $4,000 per month as the difference between what we had to pay Thrifty and what we got back from him as rent. So that's a $4,000 differential, which over the course of three and a half years rises to a $5,000 differential. So we would have stopped paying rent. We may or may not have got a lawsuit from Thrifty. That lawsuit never came. When I went back on remand, we had been out of that service station not paying rent for more than a year. Thrifty never sued us. They never did sue us. And there was never a finding that that lease necessarily continued. So there's no finding in any court, state or federal, that we had a leasehold obligation post-termination just because we were doing cleanup. The reason for that... How do you do the cleanup? We're doing the cleanup. There's still some monitoring that goes on. There's a tenant in that. Shell's in there now. But there was a period of about a year and a half, I think, it was vacant. So immediately, Your Honor, Judge Campbell, immediately, we would recognize a savings of four growing to $5,000 per month, which over 41 months would have been $2,000. The other position, the other point we raised... Over how many? I think you dropped to zero. Pardon me? You dropped to zero. It was more than $2,000. Oh, I'm sorry, $200,000. All right. Secondly... Let me interrupt you for just a minute. What you just spelled out, was that one of your damages theories in the district court? Yes. That was one half of one of the theories, which is that the location... It's the second theory, right? That comes out of 386. The second half of that is, realistically, we're going to move that motor fuel through some other outlet. We can move it through other dealers. And by January of 2003, and this is in the record at 286, actually the excerpt's 286, within Adelsberger's declaration, he says, by January 2003, which is when we're going to trial, as new renewals come up for lessee dealers, there is no rebate. There's no four cents going back per gallon. So if you look at 7.3 million gallons that went through this outlet during the injunction, for a large portion of the time, if it had gone through other lessee dealers, we wouldn't have been giving them back four cents. And given this, you know, there was never an argument that this was surplus inventory. We're going to move this through our various retailers, whether they're lessee dealers with no rebate, or branded resellers who would get a one cent per gallon. And that was in... I used the one cent calculation in coming up with the 286. I do want to emphasize also that a lot of what we're talking about here in front of this panel was not raised in the district court by the appellate. The appellate made one basic assertion. He said, if you have any profits, you have no injury. And that's just an unsupportable proposition. I mean, damage, economic loss, is the difference between what you would have achieved versus what you did achieve. He challenged your theory of damages. I mean, I understand that was his overall kind of argument, that any of your theories, the three that you advanced, don't cut it. Well, he put in no evidence. He didn't challenge any of the computations. Basically, Your Honor, I think the argument would be a causation argument. Well, the burden is on you, or on... to prove loss. Well, on the damages... Is there a presumption of loss? Because there was a wrongful injunction. I'm not sure. I'm frankly not sure if there's a presumption of loss. There's a presumption that I have... that my client has been wrongfully enjoined. And they concede that point under Nintendo. The calculation of the damages, again, we... Well, I mean, you offered the district court three different theories. Yes. Which, today, do you... now that you've had all this time, all these many years to sort through all of this, have the benefit of the district court's analysis and your brief on it... Well, I think... What is this? In your view, is it the rent is the strongest? The inability to charge the higher rent? To get a higher... I think the rent is important because this goes to an abuse we see in the PMPA context with litigation. Because what you're able to do as a franchisee by misusing a preliminary injunction is to get a win. And as Judge Campbell alluded to, Your Honor, you got a four-year lease because of your preliminary injunction. You won. In fact, the irony is, is because of the wrongful injunction, the plaintiffs actually got a better result than they were willing to accept at trial, which would have had the increase. You mean they got the four... the four years? They got four years without the increase. At the lower rate, without the increase? Without the increase. Without the increase. Whereas every other franchisee during that time frame is being, as they come up for renewal, they're being rolled onto a no-rebate-at-all program as of January 2003. They are... if it's an underperforming location, they have to pay more rent under the unique rent program or they're out. So there's a lot of inequities which kind of encourage people to game the system... Now it seemed like this was a severely underperforming station. It was. It was. That's why we wanted to get out. Because the rent here in the unique rent program seemed to be higher among the statistics that Mr. Doar offered. Right. I think there may have been one or two others that may have been higher. You better address your decision, press complaint. Restitution? Restitution. Yes. You know, this ties in with what we just talked about in terms of the potential misuse of primary injunctive relief and the PMPA beyond what it's intended for. Frankly, I have a tough time and I apologize to the panel that I didn't really address this in my principal brief, but I think Caldwell governs this case. I discussed Caldwell in some detail, which I emphasize the Arkadelphia case out of the Supreme Court, which is a 1919 case. In Caldwell what the court did here, the Ninth Circuit did, is you had the plaintiff getting a permanent injunction. In other words, winning in the trial court, getting an injunction requiring the payment of front pay in a Title VII context, it gets reversed on appeal. It goes back, the mandate doesn't even really direct anything happening. It goes back to the district court. Caldwell says there's no question they have jurisdiction on remand to correct the injustice caused by the reversal of a wrongful injunction that was issued as a permanent injunction. But there was no bond in that case, right? There was no bond, but it's made clear that in a restitution context, the insufficiency of the bond or the absence of the bond would not be a limitation on the right to get full restitution. So how do we measure the restitutionary amount, different from the damage theories you've already put forward? I think you could look at either the 386 or the 369. Those are both restitutionary measures. Underpaid rent. How do you measure it, though? In other words, four years? So the four years, if we took the rent theory, for example, the $8,000, $9,000 amount, you're saying multiply that all the way out, and whatever is in excess of the $120,000 is then restitutionary damage. Well, the whole body of damages would be restitutionary, but we've already received roughly a third to a quarter, about a third of it. So you would just say that the restitutionary award is 369, for example, and give credit for the $120,000 previously paid out of the bond. It's just a situation where the bond was insufficient. Judge Walters didn't foreclose you. He said, without prejudice, he was denying any restitution relief. He said, I'm limited to the amount of the bond on this motion, and you can just take your claim for restitution to the state court. Well, he said I could basically – Have you done that? No, I haven't. And the reason for that is, depending on – first of all, we think it's more important to make it clear that preliminary injunctions cannot be misused this way. Number two, we don't want another whole round of litigation. Frankly, for some reason or other, he did persuade a district court judge, a very respected district court judge, that injunctive relief was appropriate. So maybe the district court judge didn't impose enough bond, and maybe if that had happened, we wouldn't be here today. Well, the problem, Your Honor, with the preliminary injunction in the PMPA setting – you know, the district court judge on the merits ruled in your favor, and then we affirmed, and a district court judge determined that it was appropriate to issue the injunction. Right. And I think the district court judge was following the precedent of this circuit, which is – I think it's a couple cases out there which make the grant of preliminary injunctive relief under a very liberal standard. The standard in the Petroleum Marketing Practices Act is very favorable. Exactly. To the dealers. Right. I did a couple of these cases when I was a district court judge. Right. And I entered an injunction for the dealer. Well, you know, your hands are tied, Your Honor. That's why we tried to work with it, and that's why we insisted on the bond, and we're where we are. Okay. That's all. All right. Unless you have any other questions. No. Thank you. Okay. Thank you. Your Honor, thank you. Let me speak to that last point, because counsel keeps saying – talking about misusing the preliminary injunction. Nobody misused anything here. We asked the court for preliminary injunction. The court granted it. There's no suggestion that the court shouldn't have done that at the time, as a matter of fact, counsel has just conceded to the contrary. We didn't misuse it. We were exercising rights granted to us by Congress in good-faith litigation on the merits of the issue. There was no misuse here. There was no improper conduct. With regard to the restitution issue, I think counsel makes an important concession when he equates the restitution he's seeking with the damages he's claiming, bearing in mind that those are two very distinct concepts. All of the cases that he relies on with regard to restitution are either rape cases where there is no bond, or, as in Caldwell, that wasn't even a preliminary injunction case. That was simply a wage case involving the payment of wages. There were no payments to my client here. What there was was a continuation of an existing contract under the terms that were in place, and the continuation of that contract was under terms that were profitable to Tosco. I appreciate that they would have liked to raise the rent, and that gets to another point that counsel made in his argument. And this is in the briefs as well, and we commented on it in the briefs. He says there were two injunctions here. There were two wrongful acts by the trial court. He says there was first the issuance of the injunction, and then the refusal to modify the injunction to permit increased rents. There was no bond associated with that second order, and he lost on that issue. To go back and charge the bond that was issued simply for the purpose of maintaining a relationship in effect and charge us for the fact that the district court declined on whatever defining insufficient to showing that they presented at that time their request to increase the rent, that should not be chargeable. But he did increase the bond, didn't he? He did increase the bond, yeah. But he didn't increase the rent. He found the showing to be insufficient, and so to charge the bond for that, and Judge Paez, you said, couldn't he have argued, referring to me, couldn't he have argued that there was no agreement? I could have argued that. I did argue that. There was never an agreement. The point we made all along was that the 2002 franchise was proposed in bad faith as a way to end run the preliminary injunction. That's a position that we took consistently. There was some colloquy with regard to a state law issue. There really wasn't a state law issue. The PNPA preempts a state law with respect to the terms of non-renewal agreements, and that preemption applied. We always said, is it good faith, is it a normal course of business, is it not for the purpose of preventing renewal, and, in effect, it failed. The 2002 franchise agreement failed that third test. Your Honor, I'm out of time, but let me just say that I think that to the extent that lost profits was an issue, we should have had the right to conduct discovery on that issue when we were denied. I have that in your briefs. Thank you, Your Honor. Thank you. All right. Thank you, counsel. The case argued is submitted, and we'll stand in adjournment.
judges: Fisher, Paez, Campbell